UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JORGE BOGA BASIL,

               Petitioner,

v.                                 Case No. 8:07-CV-918-T-27TGW

IBIS AIDA de TERESA SOSA

               Respondent.

_____

REPORT AND RECOMMENDATION

This case was initiated by Petitioner Jorge Boga Basil's Petition for Return of Children Pursuant to International Treaty and Federal Statute and for Temporary Restraining Order (Doc. 1). The petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, known as the "Hague Convention" or "Convention," which is embodied in the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. 11601-11610. The petitioner, a resident of Mexico, seeks the return of his daughters, EBT and MBT, to Mexico, their habitual residence. The petitioner alleges that they were wrongfully removed from Mexico to the

United States in June 2006 by their mother, respondent Ibis Aida de Teresa Sosa.

Following a referral for an evidentiary hearing, I find that the petitioner has established that the children were wrongfully removed from Mexico, and that the respondent has not established that the petitioner acquiesced in the children's removal from Mexico or that there exists a grave risk that the children's return would expose either child to harm or an otherwise intolerable situation. Accordingly, I recommend that the children be returned to Mexico, where the pending custody issue can be resolved in the Mexican courts. Furthermore, because the respondent failed to show a lack of subject matter jurisdiction, and provided no cognizable reason for staying these proceedings, I recommend that the respondent's Amended Motion to Dismiss (Doc. 24) and Alternative Motion to Stay and for Article 15 Declaration (Doc. 25) be denied.

## I.

At the outset, an explanation of the Hague Convention is warranted.[1] The purpose of the Convention is to protect children

---

[1] The citation to the Hague Convention is T.I.A.S. No. 11670.

internationally from the harmful effects of their wrongful removal or retention and to establish legal rights and procedures to return children who have been wrongfully removed or retained from their country of habitual residence. <u>See</u> Hague Convention, Art. 1; 42 U.S.C. 11601; <u>Hanley</u> v. <u>Roy</u>, 485 F.3d 641, 644 (11th Cir. 2007). Mexico and the United States are signatories to the Convention. <u>See</u> <u>Whallon</u> v. <u>Lynn</u>, 230 F.3d 450 (1st Cir. 2000).

The object of the Hague Convention is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Hague Convention, Art. 1; <u>Lops</u> v. <u>Lops</u>, 140 F.3d 927, 935 (11th Cir. 1998), <u>cert</u>. <u>denied</u>, 525 U.S. 1158 (1999). The United States Congress, in its findings incidental to implementation of the Hague Convention into United States law, found that "[p]ersons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention" and that "[c]hildren who are wrongfully removed ... are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies."  42 U.S.C. 11601(a)(2), (4). In this regard, the Convention "intends to restore the pre-abduction status quo

and deter parents from crossing borders in search of a more sympathetic court for custody hearings." <u>Hanley</u> v. <u>Roy</u>, <u>supra</u>, 485 F.3d at 644-45.

Under the Convention, a child is considered wrongfully removed where removal "... is in breach of rights of custody attributed to a person ... under the law of the State in which the child was habitually resident immediately before the removal ... and ... at the time of removal ... those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal ..."  Hague Convention, Art. 3.  Pursuant to Article 11 of the Convention, "the judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children."

Contrary to the respondent's motion to dismiss asserting a lack of subject matter jurisdiction, this court has jurisdiction to adjudicate a claim of wrongful removal pursuant to ICARA.  42 U.S.C. 11603.  However, it only has jurisdiction to decide the merits of the wrongful removal claim, not the underlying custody dispute.  <u>Lops</u> v. <u>Lops</u>, <u>supra</u>, 140 F.3d at 936; 42 U.S.C. 11601(b)(4).

The petitioner bears the burden of establishing by a preponderance of the evidence that the children were wrongfully removed under the law of the state in which the children were habitually resident immediately before the children's removal.  42 U.S.C. 11603(e).  If the petitioner satisfies that burden, the respondent can attempt to demonstrate an affirmative defense.

The respondent has alleged three affirmative defenses.  The first defense is brought under Article 12 of the Convention, which provides that the return of a child to her habitual residence is not required when the return proceedings have been commenced more than one year after the removal and the child is now settled in her new environment.  The respondent argues that the children should not be returned because the petitioner filed his petition "on the cusp of the one year period" and the children have adjusted well to living in Florida (Doc. 36, p. 9).

The respondent's second defense is found in Article 13a of the Convention, which provides that the return of a child to her habitual residence is not required when the petitioner  "consented to or subsequently acquiesced in the removal."  In this connection, the respondent argues that the petitioner

consented to the move and knew they were residing in St. Petersburg, Florida (Doc. 22, p. 5).  The defenses under Articles 12 and 13a must be proven by a preponderance of the evidence.  See 42 U.S.C. 11603(e)(2)(B).

Respondent's last defense is presented pursuant to Article 13b of the Hague Convention, which provides that the requested state is not bound to order the return of the child if there is a grave risk that her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.  The respondent claims in this regard that the court should not return the children to Mexico "due to spousal abuse" (Doc. 36, p. 11).  Respondent must establish this Article 13b exception by clear and convincing evidence.  See 42 U.S.C. 1106(e)(2)(A).

## II.

On May 29, 2007, the petitioner instituted this action by filing a petition for the return of his children pursuant to the Hague Convention and ICARA (Doc. 1).  The petition also sought a temporary restraining order prohibiting the respondent from removing the children from the jurisdiction during these proceedings (id.).  A temporary restraining order granting that request was entered, and an evidentiary hearing on the petition was scheduled

for June 7, 2007 (Doc. 5).  However, the evidentiary hearing was continued until June 14, 2007, to give respondent, who had just retained counsel, additional time to respond to the petition (Docs. 11, 12, 15, 18).

In the interim, the respondent filed an answer, and motions to dismiss and stay this action (Docs. 22-25).[2]  The petition and motions were referred to me for a report and recommendation (Docs. 20, 26).

In accordance with the mandate in Article 11 of the Convention providing for the expeditious resolution of proceedings brought pursuant to its provisions, I conducted an evidentiary hearing on the petition on June 14-15, 2007.  The petitioner and respondent appeared with counsel.  Testimony was received from the petitioner and respondent, and the respondent's brother.  Additionally, the parties offered into evidence certain exhibits (Pet. Exs. B-J; Res. Exs. A-J), including an interim Order of Custody from the court in

---

[2]The respondent filed, in duplicate, a Motion to Dismiss (Docs. 22, 23).  Those duplicate motions are rendered moot by the respondent's filing of an Amended Motion to Dismiss (Doc. 24).

The respondent also filed an Alternative Motion to Stay and for Article 15 Declaration in order for the court to receive confirmation from the Mexican court regarding "any alleged right of the Petitioner to determine Habitual Residence" (Doc. 25, p. 2).  The respondent has not provided any cogent reason for staying these proceedings, especially in light of the mandate that these matters be resolved expeditiously.  See Hague Convention, Art. 11.

Jalisco, Mexico, dated June 12, 2007, granting to the respondent provisional custody of the children  (Res. Ex. G).

Following the evidentiary hearing, the parties were given seven days to make additional submissions (or, as I strongly urged, to resolve this matter between themselves) (Doc. 32).   The parties (who, to my disappointment, did not settle this matter) have filed supplemental memoranda (Docs. 36, 37), and the respondent has submitted an affidavit from a Mexican lawyer (Doc. 35).

The evidence at the hearing showed the following.   The petitioner, a citizen of Uruguay, who has been a resident of Mexico for twenty-three years, is the father of EBT and MBT.   The respondent, a Mexican citizen, is the mother of EBT and MBT.

In 1995, the petitioner and the respondent met in Mexico and began a personal and a professional relationship.[3]  On March 16, 1999, their first daughter, EBT, was born in Jalisco, Mexico (Pet. Ex. C).  On June 8, 2003, their second daughter, MBT, was born in the same hospital (Pet. Ex. E).

---

[3]The parties started a business fabricating textile seriography.

Although they never married, from the time of EBT's birth, until June 2005, the petitioner and respondent lived together with their children in Jalisco, Mexico.   In June 2005, the parties' personal relationship ended, and the respondent moved with the children to another residence in Jalisco.   The parties' business ended about the same time, leaving the petitioner deeply in debt.[4]

It is undisputed that the petitioner had a father/daughter relationship with his children until June 2005.   Further, it is undisputed that, after the parties' separation, the petitioner continued to spend time with both children.   In this regard, the petitioner testified that he saw EBT and MBT on a weekly basis.   He stated that they had overnight visits with him, and they went to restaurants and on nature walks.   He also testified that he met EBT at school a couple of times a week and took her to horseback riding and swimming lessons.

The petitioner testified that he tried to be a loving father and make the children happy, and the respondent agreed that the children had fun with him (see also Pet. Exs. G-J ).   In sum, the petitioner stated that he was

---

[4]The petitioner negotiated the payment of the debt (Pet. Ex. B), which he testified left him with no financial resources.

always physically present in their lives, but economically he lacked financial resources that year due to his failed business.  Nonetheless, he testified that he did pay for EBT's schooling (see Pet. Ex. D).

The respondent disputed details of the petitioner's visitation after they separated in June 2005, such as its frequency.[5]  She also testified that the petitioner had provided no financial support for the children after their separation.  In particular, the respondent testified that she, not the petitioner, paid for EBT's schooling.

Additionally, the respondent recounted a tumultuous relationship with the petitioner, which caused her to fear him.  She testified that the petitioner frequently screamed at her and called her names.  The respondent also stated that the petitioner had pushed her and grabbed her by the shoulders.  Although the petitioner admits that he had arguments with the respondent, he denies physically abusing her.  The respondent's testimony that

---

[5]The respondent also testified that, when the children visited with the petitioner at his home, he did not feed them nutritious food and failed to insure they exercised good hygiene.  The petitioner disputes this testimony.

The petitioner admitted to smoking marijuana, but stated that he did not use drugs around the children or leave drug paraphernalia around them.

she and the petitioner had a volatile relationship, and that she was fearful of him, is credible.

The respondent testified that she and the children regularly took vacations outside the country.  She stated that, during an argument in June 2005, the petitioner ripped up the children's passports.  It was not until October 2005 that she was able to convince the petitioner to sign for the children's passports, which apparently was a requirement for their issuance.

The respondent stated that she spoke with the petitioner in February 2006 about moving the children to Florida after EBT lost her seat in her Mexican private school.  The respondent stated that the petitioner told her to do whatever she wanted.  The respondent  testified that the petitioner had also agreed to this move in October 2005, and "many years" before.   The petitioner denies having any such conversation with the respondent, and denies giving his permission for the children to leave Mexico permanently. For the reasons explained below, I reject the respondent's testimony that she discussed with the petitioner moving the children permanently to the United States or that he agreed to it.

On March 30, 2006, the respondent filed a lawsuit in Jalisco, Mexico, against the petitioner seeking to terminate his parental rights, which are known in Mexico as "patria potestas" (Res. Ex. A).  The respondent filed a second complaint against the petitioner on May 26, 2006, seeking a restraining order against him for allegedly threatening to kill her and take the children away from her because she sought to terminate his parental rights (Res. Ex. D).   The restraining order was granted, and it prohibited the petitioner from harassing the respondent and the children (Res. Exs. E, F).[6]

On June 1, 2006, the petitioner had lunch with his children at a restaurant in Jalisco, Mexico, to celebrate his birthday.  When the respondent came to pick up the children, she told the petitioner that they were leaving for a weekend trip to Puerta Vallarta, Mexico.   That was the last time the petitioner saw his children in Mexico.

The respondent testified that, on June 6, 2006, she took the children to her mother's home in St. Petersburg, Florida.  She acknowledges not telling the petitioner on June 1 that she was taking the children to the United States.  Further, she testified that, after June 1, 2006, she made no

---

[6]The petitioner denies threatening the respondent and was not personally served with the lawsuit or the restraining order.

effort to contact the petitioner because she was afraid of him and that he would come and kill her.

The petitioner testified that, on or about June 6, 2006, after he was unable to contact the respondent, he contacted the respondent's mother, Aida Maria Sosa Cespedes.  He testified that Cespedes said the respondent had moved to Puerto Rico with the children.  Cespedes submitted an affidavit that she told the petitioner that she was going to Puerto Rico and that the respondent was in Florida (Res. Ex. H).  For the reasons stated below, Cespedes's statement lacks credibility.

The petitioner testified that he searched for his children during the months of July and August.  He stated he was unable to act during September or October due to the development of hepatitis.  On November 29, 2006, the petitioner submitted a Return Application to the Central Authority of Mexico (Pet. Ex. F) in order to locate his children.  The petitioner testified that he subsequently learned that the respondent and the children were residing in St. Petersburg, Florida.

On June 6, 2007, the respondent filed with the Mexican court an application for temporary custody of the children (Res. Ex. J).  On June 12,

2007, the Mexican court issued an Order granting the respondent provisional

custody over the children (Res. Ex. G).[7]

III.

In order to establish a wrongful removal under the Convention,

the petitioner must establish by a preponderance of the evidence (<u>Hanley</u> v.

<u>Roy</u>, <u>supra</u>, 485 F.3d at 645):

> (1) the child has been removed [from her state of
> habitual residence] ... in violation of the petitioner's
> "rights of custody" (i.e., "rights relating to the care
> of the person of the child ... either jointly or
> alone"); and (2) "at the time of removal ... those
> rights were actually exercised, either jointly or
> alone, or would have been so exercised but for the
> removal...."

A.  In this case it is undisputed that Jalisco, Mexico,  is where the

children were born and resided until the respondent moved the children to the

United States in June 2006.  Additionally, prior to her removal, EBT, who was

of school age, had only attended school in Jalisco.

---

[7]The respondent misleadingly states in her trial brief that the Mexican court held
that "the Petitioner had simply 'visitation'" (Doc. 36, p. 4).   Rather, the English
interpretation of that Order indicates that the petitioner is not precluded from visiting the
children.  It does not purport to address any limitation of patria potestas.

Thus, other than vacations outside the country, Mexico is the only place EBT and MBT ever resided prior to their removal to the United States in June 2006. Accordingly, Jalisco, Mexico, was the children's habitual residence at the time of their removal.[8]

B. The petitioner contends that, under the Civil Code for the State of Jalisco, Mexico, he possessed "rights of custody" at the time of the children's removal (Doc. 37, pp. 4-10). See Hanley v. Roy, supra, 485 F.3d at 645 ("the existence of 'rights of custody' are determined by the law of the country in which the child habitually resides at the time of removal"). The respondent disputes that the petitioner has custody rights (Doc. 36, pp. 6-9).

The Convention defines broadly "rights of custody" as including the "rights relating to the care of the person of the child, and, in particular, the right to determine the child's place of residence." Hague Convention, Art. 5.[9]

---

[8]The respondent has asserted that the children's habitual residence is the United States because, as the children's custodian, the respondent may unilaterally select Florida as their habitual residence. This contention is patently frivolous since in many instances it would render the Convention meaningless.

[9]This is contrasted with the far more limited rights of access, which include the right to take the child for a limited period of time to a place other than the child's habitual residence. Hague Convention, Art. 5b. It is a violation of a right to custody, not a right of access, that triggers the Convention's remedy of returning the child to the country of habitual residence.

The Eleventh Circuit has stated (Hanley v. Roy, supra, 485 F.3d at 647 (emphasis in original)):

> [i]t is crucial to note that the violation of a single custody right suffices to make removal of a child wrongful.  That is, a parent need not have "custody" of the child to be entitled to return of his child under the Convention; rather, he need only have one right of custody.  Further, he need not have a sole or even primary right of custody.

The intention of the Convention is "'to protect all the ways in which custody of children can be exercised,' and the Convention favors 'a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration.'" Furnes v. Reeves, 362 F.3d 702, 716 n.12, cert. denied, 543 U.S. 978 (2004)(citation omitted)(emphasis in original).

The petitioner contends that his "right to custody" is established by the Mexican doctrine of patria  potestas (Doc. 37, pp. 4-10).  Patria potestas is a doctrine with ancient roots in Roman law.  Whallon v. Lynn, supra, 230 F.3d at 457.  It "represents a more generalized concept of parental authority," which is distinct from physical custody rights on the one hand, and mere visitation rights on the other.  Id. at 456-57.

Specifically, the Jalisco Civil Code defines "patria potestas" as the "series of reciprocal rights and obligations that exist between the father and mother ... and the non-emancipated minor children" (Doc. 37, Ex. A-1, Art. 578). Patria potestas encompasses "a positive duty of constant care that requires effective and constant performance to achieve its purpose and [i]t confers the right and duty to discipline in a prudent and moderate manner, with the purpose of harmonic and positive education" (id. at Art. 580, Sections III and IV; see also Third Civil Collegiate Court of the First Circuit of Mexico, Weekly Federal Court Report, January 2003, p. 1816 (Doc. 37-3) (patria potestas includes the obligation to watch over the child's physical, spiritual and moral development, as well as the child's preparation to practice a useful profession)). Patria potestas is exerted by both parents (Doc. 37, Ex. A-1, Art. 581).[10]

Patria potestas includes the parent's participation "in the care of the child," which constitutes a custody right under the Convention. See Whallon v. Lynn, supra, 230 F.3d at 458 (patria potestas confers custody

---

[10]Further, the Jalisco Civil Code distinguishes patria potestas from custody (see, e.g., Doc. 37, Ex. A-1, Art. 415, Sections I and II; Art. 566; Art. 585), so that one parent's physical custody of a child does not nullify the non-custodial parent's rights.

rights because it "implies a meaningful, decisionmaking role in the life and care of the child").[11]  Further, patria potestas affords participation in selecting the child's residence, which is another component of custody rights. <u>See</u> <u>Furnes</u> v. <u>Reeves</u>, <u>supra</u>, 362 F.3d at 714-15 ("ne exeat" right, which requires both parents to consent to a child living abroad, constitutes a right of custody as defined in the Convention, as it amounts to a right to determine the child's place of residence).

Thus, under the doctrine of patria potestas, both parents must consent to the removal of the child from the country.  <u>See</u> Third Civil Collegiate Court of the First Circuit of Mexico, Weekly Federal Court Report, <u>supra</u> (under the doctrine of patria potestas, a parent that holds custody over a minor child cannot unilaterally move the child to a new residence).  For example, at the evidentiary hearing the respondent testified that the petitioner's signature was required in order for the children to obtain passports.  This demonstrates control over whether the children could even depart the country of Mexico, let alone reside in another country.

---

[11]Additionally, district courts have acknowledged that the doctrine of patria potestas confers custody rights. <u>Garcia</u> v. <u>Angarita</u>, 440 F.Supp.2d 1364 (S.D. Fla. 2006); <u>Lalo</u> v. <u>Malca</u>, 318 F.Supp.2d 1152, 1156 (S.D. Fla. 2004); <u>Giampaolo</u> v. <u>Erneta</u>, 390 F.Supp.2d 1269 (N.D. Ga. 2004).

The respondent does not directly dispute that the doctrine of patria potestas affords rights of custody within the broad meaning of that term in the Convention.   Rather, the respondent relies heavily upon the Mexican court's Order of June 12, 2007, that grants provisional custody of the children to the respondent and upon the applicable provisions of the Jalisco Civil Code that gives custody of minor children to the mother   (Doc. 36, pp. 6-9). However, the respondent's custodial rights do not nullify the petitioner's rights under the doctrine of patria potestas.  See Hanley v. Roy, supra, 485 F.3d at 646-47; Furnes v. Reeves, supra, 362 F.3d at 717; Whallon v. Lynn, supra,  230 F.3d at 457.

The respondent also argues that the Mexican court's Order of June 12, 2007, limits the petitioner to visitation rights, which are not considered rights of custody under the Convention (Doc. 36, p. 8).  However, that Order does not expressly terminate patria potestas.  Rather, the English translation of that Order simply states that "[t]his determination does not imply that [the petitioner] has lost his right to visitation" (Doc. 24-2, p. 3). Since the Jalisco Civil Code provides that suspension or termination of patria potestas in this circumstance must be expressly stated in an Order, see Doc.

37-2, Arts. 598-601, it is not reasonable to infer that the Mexican Order has nullified the petitioner's patria potestas.

Moreover, even if the Order somehow limits the petitioner's parental rights, it is inapplicable to this wrongful removal action because the Order was not in place at the time of the removal. Thus, the First Circuit pointed out in <u>Whallon</u> v. <u>Lynn</u>, <u>supra</u>, 230 F.3d at 459, that "the Convention refers specifically to [the petitioner's] rights of custody at 'the time of removal.'"

The respondent has also submitted an affidavit of an attorney from Mexico, Guillermo Alberto Orgarrio Saucedo, who offers his opinion that the respondent "acted correctly when changing her address, in consideration of the best interests of her daughters" (Doc. 35, p. 1 of the Translation). However, this opinion is plainly off the mark. It does not purport to opine whether the respondent's actions were lawful under the Hague Convention. Moreover, even if it did, the opinion would be appropriately disregarded since this court does not need an opinion from a lawyer to determine whether a violation of the Convention has occurred. <u>See</u>

Montgomery v. Aetna Casualty & Surety Co., 898 F.2d 1537, 1541 ("A witness ... may not testify to the legal implications of conduct....").

Furthermore, what is particularly noteworthy about the Mexican lawyer's opinion is its silence on the issue of patria potestas, the one issue where a legal opinion from a Mexican lawyer would have been material. See Rule 44.1, F.R.Civ.P. Seemingly, if the petitioner had no parental rights under that doctrine, the lawyer would have said so. The failure to state that the petitioner had no such rights confirms the conclusion that patria potestas does provide the petitioner with parental rights.

Therefore, the petitioner's patria potestas, which he possessed at the time of the removal, constitutes "rights of custody" as that term is defined under the Convention.

C.   The petitioner must also show that he was exercising his custody rights at the time of removal. In this connection, it is noted that courts define "exercising custody" broadly and find that a parent is exercising custody "whenever a parent with de jure custody rights keeps, or seeks to keep, any regular contact with his or her child." Friedrich v. Friedrich, 78 F.3d 1060, 1065 (6th Cir. 1996).

Here, the petitioner clearly has shown that he was exercising his patria potestas at the time of the children's removal. Thus, the undisputed testimony shows that the petitioner visited, and engaged in activities, with the children on a fairly regular basis prior to their removal. Although the petitioner provided little, if any, financial support for them after the parties' separation in June 2005 due to his economic circumstances, this does not mean he was not exercising custody rights under the terms of the Convention. See id.

In sum, the petitioner has established a prima facie case of wrongful removal under the Convention by demonstrating that the respondent removed the children from their habitual residence in Jalisco, Mexico, to the United States. He has shown further that, under the Mexican doctrine of patria potestas, he retained rights of custody and that he was exercising those rights at the time of the removal.

IV.

The respondent argues that, even if the petitioner establishes a prima facie case of wrongful removal, the court is not bound to remove the children from the United States as a result of her affirmative defenses.

However, the respondent has failed to satisfy her burden of proof as to any of those defenses.

     A.  The respondent argues first that, pursuant to Article 12 of the Convention, the children should not be returned to their habitual residence in Mexico because they are well settled in Florida (Doc. 36, pp. 9-10).  This argument is frivolous.  As the petitioner points out (Doc. 37, pp. 13-14), a child's adjustment to life in the United States is a consideration under Article 12 of the Convention only when more than one year has elapsed between the child's removal and the commencement of return proceedings.

     In this regard, Article 12 of the Convention provides:

> Where ... a period of less than one year has elapsed from the date of the wrongful removal ... the authority concerned shall order the return of the child forthwith.  The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year ... shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

     The plain terms of the Convention state that the well-settled defense does not apply if a period of less than one year has elapsed from the date of removal to the date of filing a petition seeking a child's return.  In that

circumstance, the Convention provides that "the authority concerned <u>shall</u> order the return of the child forthwith" (<u>id</u>.)(emphasis added).  Accordingly, the well-settled defense requires a showing that "the petition for return was filed more than one year from the removal or retention <u>and</u> the child is well-settled in her new environment."  <u>Furnes</u> v. <u>Reeves</u>, <u>supra</u>, 362 F.3d at 712 (emphasis in original).

Here, the petitioner unquestionably filed his petition with this court within a year of the children's removal.  Thus, the respondent testified that she removed the children from Mexico on June 6, 2006, and the petitioner filed his petition on May 29, 2007.  Consequently, the well-settled defense is clearly not available to the respondent.

The respondent attempts to invoke the defense on the basis that the petition was "brought on the cusp of the one[-]year period" (Doc. 36, p. 9).  In fact, the petition was not brought on the cusp of the one-year period since more than one week remained in that period.  In all events, unlike horseshoes, closeness does not count.  The express terms of the Convention require the expiration of a one-year period before the well-settled defense comes into play.

It is noteworthy that the respondent makes this baseless contention her first argument with respect to her affirmative defenses. Since the argument is patently insufficient, it raises questions about the merits of her remaining contentions regarding the affirmative defenses.

The respondent's second contention is that the petitioner has consented to, or acquiesced in, the children's removal (Doc. 36, pp. 10-11). As indicated, Article 13a of the Convention provides that the return of a child is not required when the person opposing the return establishes by a preponderance of the evidence that the person seeking return of the child "consented to or subsequently acquiesced in the removal."

The petitioner testified, convincingly, that he did not give permission for their removal. Thus, he stated unequivocally that he did not discuss with the respondent moving the children permanently to the United States. He said further that he would never have given the respondent permission to do that. The respondent, on the other hand, testified that she had several conversations with the petitioner about moving the children to the United States. In particular, the respondent testified that she approached the petitioner about moving the children in February 2006, when EBT lost her

seat in the Mexican private school.   However, on cross-examination, the respondent stated that the February 2006 conversation concerned the children coming to the United States to study for one year, not permanently.

The respondent's testimony that the petitioner repeatedly consented to the children permanently residing in the United States did not appear to me to be credible and I do not accept it over the petitioner's contrary testimony.  Among other things, accepting the respondent's testimony that she and the petitioner had a tumultuous relationship, and that she was fearful of him, it is implausible that she repeatedly discussed with him moving to Florida with the children.  Rather, as the respondent testified, she wanted the petitioner to know as little about her life as possible.  Thus, the respondent testified that she did not contact the petitioner after they moved to St. Petersburg because she was fearful that he would harm her.  The plain implication from this testimony is that the petitioner was not aware of this move, that he did not agree to it, and that the respondent did not want him to know her whereabouts.

This is substantiated by her surreptitious departure to the United States with the children, which would be unnecessary if the petitioner had

agreed to it.  Moreover, there seemingly would be no need for the respondent to file an action in Mexico to terminate the petitioner's patria potestas just a few weeks prior to moving to the United States if the petitioner consented to this change of residence.

The respondent argues that the petitioner's signature on the children's applications for passports in October 2005 shows that he gave permission for the children's move to the United States.  However, the petitioner testified credibly that the passports were for the children to vacation internationally, as they had regularly done with the respondent.  Therefore, this does not show he gave permission for them to reside permanently in the United States.[12]

The respondent also makes the remarkable argument that the petitioner acquiesced in the children's removal to Florida because, after she absconded with them, the petitioner could have located them more quickly

---

[12]The respondent relies on the affidavits of her mother and her parents' gardener to show that the petitioner consented to the children's change in residence (Doc. 36, p. 10, n.11; Res. Exs. H, I).  However, based on the petitioner's demeanor and manner in which he testified at the hearing, I credit his testimony that he did not give such consent.  Furthermore, the mother's statement in this regard should be discounted because it does not appear to be based on personal knowledge (see Res. Ex. H).  The gardener's affidavit is also problematic because his general statement does not show specific consent to the move (see Res. Ex. I).

than he did.  The petitioner testified that he never abandoned his children, and that he had no contact with his daughters because they "were hidden from him."

The respondent's argument presupposes that the petitioner knew from the outset that she moved to her mother's home in St. Petersburg (Doc. 36, pp. 10-11).  However, the credible evidence shows that he did not become aware of the respondent's location until months later.  Thus, it is undisputed that, when the respondent removed the children from Mexico in June 2006, she did not tell the petitioner that she was leaving the country, and that she then intentionally made no effort to contact him.  Further, the petitioner testified credibly that, when he contacted the respondent's mother regarding their whereabouts, the mother told him that they had moved to Puerto Rico.[13]

Although the respondent's mother, Aida Maria Sosa Cespedes, submitted an affidavit stating that she had told the petitioner that the respondent was in Florida and that it was she who was going to Puerto Rico (Res. Ex. H),  this statement lacks credibility.  Thus, the petitioner called

---

[13]The uncontroverted testimony that he telephoned the respondent's mother inquiring about their whereabouts supports the petitioner's contention that he did not know where they were.

regarding the whereabouts of his children and not to have a conversation with the respondent's mother, so that it is implausible that the subject of her plans would come up.  Even more significant, Cespedes averred that the petitioner mistreated her daughter (id.) and, therefore, it is incredible that she would readily inform him of her daughter's location.[14]

Furthermore, the respondent cannot establish acquiescence on the basis of some delay by the petitioner.  The petitioner testified that he searched for his children during the summer, but that his search was thereafter delayed because he was ill during September and October 2005 with hepatitis.  He then appropriately filed the Return Application in accordance with the Convention (Pet. Ex. F).  The petitioner reasonably explained that, after learning of the children's location, he did not contact them or the respondent for fear they would flee.

In addition, the extraordinary expense and effort the petitioner has gone through to locate the children by exercising his rights under the Convention severely undercuts any argument that the petitioner consented to,

---

[14]The fact that this testimony is presented in an affidavit also negatively affects the weight that it can be given, as the petitioner had no opportunity to cross-examine the declarant on this important point.

or acquiesced in, the children's removal to the United States.  See  Furnes v.

Reeves, supra, 362 F.3d at 724.  Accordingly, the respondent's defense of

consent or acquiescence should be rejected.

Finally, the respondent has alleged that returning the children to

Mexico would place them at a grave risk of harm due to spousal abuse (Doc.

36, pp. 11-13).  This contention is also meritless.

Pursuant to Article 13b of the Convention, the court may decline

to return a child wrongfully removed from their habitual residence if it is

established by clear and convincing evidence that the return would present a

"grave risk" that the child would be exposed to "physical or psychological

harm or otherwise place[d] ... in an intolerable situation."  This exception is

construed narrowly.  Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 376 (8th

Cir. 1995).  Importantly, the "grave risk" must pertain to the child, rather than

to the removing parent.  Tabacchi v. Harrison, 2000 WL 190576 at *13 (N.D.

Ill., Feb. 10, 2000).

The evidence presented in support of this defense is sparse and

weak.[15]   The respondent testified that the petitioner has a history of

_____

[15]The respondent's oral motion at the evidentiary hearing for a continuance "in
order to further the evidentiary foundation for this defense" (see Doc. 36, pp. 11-12)

psychological abuse towards her with some degree of physical conduct, such as shaking her or throwing objects.

However, with regard to the children, there is no evidence of abuse. Thus, the petitioner testified, without dispute, that he never abused the children. See Whallon v. Lynn, supra, 230 F.3d at 460 (domestic abuse not sufficient to sustain the defense of grave risk when those actions were not directed at the children). To the contrary, the petitioner's testimony showed him to be a loving father. Indeed, the respondent's testimony that she would have allowed the petitioner to have visitation with the children in the United States militates against the notion that the petitioner would endanger the children.

Further, the respondent testified that the spousal abuse did not occur in the children's presence. See Tabacchi v. Harrison, supra. Moreover, the respondent's testimony of abuse is much less compelling than the conduct alleged in Conti v. Xhilda Tushe Conti, 8:04-CV-819-T-27TBM, May 17, 2004, which this court found did not pose a grave risk of harm.

_____

implicitly acknowledges that the evidence she presented does not rise to the level of a grave risk.

Finally, it is noted that the pertinent inquiry is whether there is a grave risk of harm upon the children's *return* to Mexico. Since the children will remain in the custody of their mother, who will reside separately from the petitioner, the opportunity for domestic abuse is minimized. Further, as the respondent stated in her brief, "the home state court of Mexico has already decided to protect the Respondent and the children by the granting of a restraining order" (Doc. 36, pp. 12-13). Therefore, these measures provide additional protection for the respondent and the children upon their return.

In sum, the respondent has failed to present any evidence that there is a risk of grievous harm to the children if they are returned to Mexico. Therefore, this defense should be rejected as well.

## V.

In conclusion, the petitioner has established that the respondent's removal of the children from their habitual residence in Mexico violated his rights of custody under Mexican law, and was therefore wrongful under the Convention. Moreover, the affirmative defenses asserted by the respondent are all meritless. Therefore, I recommend that the Petition for Return of Child to Petitioner (Doc. 1) be granted, and that, in accordance with Article 1a of the

Convention, EBT and MBT be returned promptly to Mexico pending the outcome of the custody proceeding.

Further, since this court clearly has jurisdiction over this matter pursuant to 42 U.S.C. 11603, and there is no justification for delay, I recommend that the respondent's Motion to Stay (Doc. 15) and Motion to Dismiss (Doc. 24) be denied.

Respectfully submitted,

DATED: JULY 10, 2007

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. 636(b)(1).